David PRICE, Plaintiff,

v.

VIKING PENGUIN, INC., Peter Matthiessen, and Bruce Ellison, Defendants.

Civ. 4–85–819.

United States District Court, D. Minnesota, Fourth Division.

Jan. 13, 1988.

Daniel P. O'Keefe, and Roger J. Magnuson, Dorsey & Whitney, Minneapolis, Minn., appeared on behalf of plaintiff.

Martin Garbus, and Richard Kurnit, Frankfurt, Garbus, Klein & Selz, New York City, appeared on behalf of defendants Viking Penguin, Inc., and Peter Matthiessen.

Barbara F.L. Penn, St. Paul, Minn., also appeared on behalf of Viking Penguin, Inc.

Bruce Ellison, Rapid City, S.D., appeared pro se.

### MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiff David Price, an agent of the Federal Bureau of Investigation (FBI), brought this defamation action against defendants Viking Penguin, Inc. (Viking), Pe-

ter Matthiessen, and Bruce Ellison in connection with the publication of the book *In the Spirit of Crazy Horse.* Plaintiff alleges that the book defames him in connection with events at Wounded Knee, South Dakota in 1973 and events surrounding and subsequent to the killing of two FBI agents on the Pine Ridge Indian Reservation in 1975. Plaintiff seeks $25 million in compensatory damages. Diversity jurisdiction is alleged. The matter comes before the court on motions for dismissal or summary judgment brought by defendants Viking and Matthiessen.

## I.

### A.

This action has been vigorously litigated in more than one forum.[1] Plaintiff commenced the action on February 9, 1984 in the United States District Court for the District of South Dakota against defendant Viking, the publisher of the book *In the Spirit of Crazy Horse;* defendant Matthiessen, the author of the book; and defendant Ellison, who allegedly supplied information for the book. Plaintiff asserted causes of action for defamation, intentional infliction of emotional distress, false light invasion of privacy, and prima facie tort. Plaintiff also filed an identical action in South Dakota state court. After the state court granted the motion of defendants Viking and Matthiessen to dismiss for lack of personal jurisdiction,[2] plaintiff and defendants Viking and Matthiessen stipulated

to the transfer of the federal action to the District of Minnesota. The federal action was transferred here on June 25, 1985.

Defendants Viking and Matthiessen then moved to dismiss and for a stay of discovery pending determination of their motion. Discovery was stayed on October 7, 1985, and the court subsequently dismissed certain of plaintiff's claims. These were claims for intentional infliction of emotional distress, false light invasion of privacy, and prima facie tort, as well as a number of the defamation allegations. *Price v. Viking Press, Inc.,* 625 F.Supp. 641 (D.Minn.1985). The court determined that plaintiff was entitled to further discovery before any ruling with respect to the remaining defamation allegations. *Id.* at 648–49. After settlement efforts by a special master[3] failed to bear fruit, the court lifted the stay of discovery on August 5, 1986.

Discovery thereafter ensued for a period in excess of one year.[4] Depositions were taken of plaintiff; defendant Matthiessen; defendant Ellison; Elisabeth Sifton, Matthiessen's editor at Viking; James Leach, an attorney who worked with the Wounded Knee Legal Defense/Offense Committee (WKLDOC); Karen Northcott, a WKLDOC aide; Kenneth Tilsen, an attorney who was one of the founders of WKLDOC and other persons associated with the book.[5] In an order dated December 12, 1986, the court granted, in part, a motion by plaintiff to compel discovery and established a standard for the scope of discovery. 113 F.R.

1. This court has issued a number of previous orders and opinions in this case which provide additional background. *See, e.g.,* 625 F.Supp. 641 (1985); 113 F.R.D. 585 (1986); 654 F.Supp. 1038 (1987); 115 F.R.D. 40 (1987); 115 F.R.D. 43 (1987).

2. The state court also granted a motion by defendant Ellison to dismiss for failure to state a claim.

3. The court convened a conference call with the parties on January 10, 1986 to discuss appointment of a settlement master. At the start of the conference, the court referred to the policy considerations on each side of the case and the conflicting ways the parties view themselves. Plaintiff no doubt sees himself as a public servant performing difficult and dangerous work who has been unfairly and meanly portrayed for his efforts. Defendants, on the other hand,

say they are performing the important function of criticizing government conduct through the full dissemination of information and ideas. The parties agreed to appointment of a special master, and a number of settlement attempts followed without success.

4. In addition to discovery between the parties, defendants have also sought discovery from the government to establish the truth of the allegedly defamatory statements. Disputes arose between defendants and the government over this discovery, some of which also involved plaintiff.

5. Some of these depositions were quite extensive. For example, the deposition of Matthiessen took place over eight days, and its transcript exceeds 1100 pages in length.

D. 585 (D.Minn.1986). Another motion to stay discovery by defendants Viking and Matthiessen was denied on February 20, 1987. 115 F.R.D. 40, 41 (D.Minn.1987). A petition of defendants Viking and Matthiessen for favorable findings toward disclosure of grand jury testimony was granted in part on March 2, 1987. *Id.* at 42–43. On March 16, 1987, the court extended the deadline to allow further discovery to be conducted. 115 F.R.D. 43 (D.Minn.1987). The parties were then given the opportunity to supplement the record with additional evidence obtained through this discovery. Defendants again moved to extend the discovery deadline on September 9, 1987; plaintiff opposed the motion. Rather than reach the merits of this dispute, on September 29, 1987, the court stayed any additional discovery pending resolution of the motions now before it.

On February 19, 1987, the court dismissed the claims against defendant Ellison on the basis of res judicata. 654 F.Supp. 1038 (D.Minn.1987). A counterclaim asserted by defendant Ellison remains in the case, however. At the hearing on his motion, Ellison stated that he also has an action against Price pending in South Dakota state court. He is a resident of South Dakota and never agreed to the transfer of plaintiff's case to this district. He noted at that hearing that he considered the action to be "more proper in South Dakota." Transcript of Proceedings at 5 (Jan. 9, 1987).[6]

Now before the court are three motions made by defendants Viking and Matthiessen.[7] First, defendants move for dismissal on the ground that the allegedly defamatory statements are protected opinion or merely reports of accusations.[8] Alternatively, defendants move for summary judgment on the ground that plaintiff has failed to make a showing of actual malice by clear and convincing evidence. Finally, in what was labeled a "cross motion," defendants move for dismissal on the ground that the assertion of privilege by the federal government has made a fair trial impossible. In connection with these motions, the parties have submitted an enormous volume of materials, including multiple memoranda, complete deposition transcripts, lengthy affidavits with numerous exhibits, and the book itself.

## B.

On this motion for summary judgment, the facts must of course be viewed in the light most favorable to plaintiff. The book itself is at the heart of the case, and in the course of this litigation the court has read its entire 611 pages of text and notes.

Defendant Matthiessen is a well-known author of approximately 18 books and numerous magazine and newspaper articles.[9] He states that he conducted research for the book over a number of years. Many of the persons Matthiessen interviewed in connection with his research were affiliated with organizations seeking to protect or

---

**6.** The record shows no effort by Ellison to conduct discovery or prosecute his counterclaim in this court. The deadline for discovery is now past. In view of his failure to prosecute his counterclaim here and his apparent ability to proceed with it in South Dakota state court, his federal counterclaim should be dismissed without prejudice.

**7.** In view of the dismissal of the claims against defendant Ellison, "defendants" shall hereafter denote defendants Viking and Matthiessen.

Plaintiff has also filed motions which have not yet been completely resolved. On October 1, 1987, he moved to amend the pleadings, to compel discovery, and to impose sanctions. In an order dated October 28, 1987, the court granted plaintiff's unopposed motion to amend the complaint to correct the name of the corpo-

rate defendant and stayed consideration of the remaining motions pending resolution of defendants' motions. Plaintiff seeks sanctions pursuant to Fed.R.Civ.P. 26(g), 37(a)(4) and 37(b)(2) on the ground that counsel for defendants failed to comply with the court's order governing the scope of discovery at the deposition of Matthiessen. Plaintiff also wants attorney's fees and costs that would be incurred if Matthiessen were deposed again.

**8.** Because the parties have presented matters outside the pleadings which the court has considered, the motion to dismiss should be treated as one for summary judgment. Fed.R.Civ.P. 12(c).

**9.** For example, Matthiessen is the author of *The Snow Leopard*, for which he received the National Book Award in 1978.

promote the interests of American Indians. Matthiessen also interviewed plaintiff and attempted to interview Evan Hultman, a former United States Attorney connected with the events described. Prior to its publication in 1983, an excerpt from the book was published in *The New York Times* in different form. In preparing the book for publication, Matthiessen provided copies of the manuscript to a number of individuals familiar with the facts described and solicited their opinions. Several persons identified potential inaccuracies in the book.[10] After this action was commenced in 1984, defendant Viking withdrew all hardcover copies from circulation; a paperback version has never been published.

Though the book's historical scope is broad, discussing the relationship between the Indian peoples and the federal government from 1835 to 1981, it largely focuses upon events related to the killing of two FBI agents on the Pine Ridge Indian Reservation on June 26, 1975. It examines conditions on the reservation and the subsequent government investigation into the killings. It also reports on the indictment, trial and conviction of Leonard Peltier, a member of the American Indian Movement (AIM), on two counts of murder. In the words of the book's dust cover, Matthiessen "presents disturbing new evidence, obtained under the Freedom of Information Act in 1980 and 1981, which suggests that Peltier may well be innocent, and argues persuasively that in any event he deserves a new—and fair—trial." Considerable space in the book is also devoted to a discussion of the occupation of Wounded Knee in 1973 and the federal government's response to it.

Prior to writing the book, Matthiessen entered into an agreement with Telos Film Corp. (Telos) and the Leonard Peltier Defense Committee (Defense Committee). Under this agreement, which is dated Octo-

ber 1, 1980, Telos and the Defense Committee agreed to provide Matthiessen with access to information relating to Peltier, including an exclusive interview with Peltier. In return, Matthiessen agreed to share his advances and royalties from the book, providing Telos and the Defense Committee with 40 percent of the first $100,000, and 55 percent of all subsequent proceeds. This arrangement was also set forth in Matthiessen's contract with Viking, which is dated June 8, 1981. The book does not disclose this agreement, except insofar as it acknowledges the assistance of the Defense Committee.

Plaintiff Price figures fairly prominently in the book, both in connection with the Wounded Knee trials and in connection with events surrounding the killing of the two FBI agents. Twelve pages of the book recount in detail a telephone conversation between Price and Matthiessen, in which Price sets forth his view of many of the events described in the book. *In the Spirit of Crazy Horse* 461–72 (1983).[11] Matthiessen concludes his description of the conversation by referring to Price as "the man regarded wrongly as the villain of the tale...." P. 472.

> Price alleges that statements in the book stated or suggested that [he] is a murderer; that he knowingly suborned perjury; that he violated constitutional and other rights in the performance of his duties as an FBI Special Agent; that he unlawfully harrassed [sic] American Indian Movement ("AIM") members and attempted to destroy AIM; that he is a liar; that he is corrupt; that he is vicious and violent; that he is a racist; that he willfully neglects the duties of his job; and that he was engaged in illegal and wrongful conduct.

Complaint paragraph 9. The court's December 30, 1985 order dismissed 14 of the allegedly defamatory statements from the complaint; 20 such statements remain to

---

10. For example, James Leach, an attorney with WKLDOC, criticized Matthiessen's theory that the federal government's treatment of Indians at Wounded Knee and Pine Ridge was driven by interests in mineral deposits on Indian lands. There has been no showing, however, that any

of these persons identified inaccurate statements that concerned plaintiff.

11. The book shall hereafter be referred to by page number only.

be addressed.[12] These statements can be loosely grouped around three events. First, a number of the allegations concern the testimony of Louis Moves Camp at the trial of Dennis Banks and Russell Means arising out of the 1973 occupation of Wounded Knee, South Dakota. *See United States v. Banks*, 383 F.Supp. 389 (D.S. D.1974), *appeal dismissed*, 513 F.2d 1329 (8th Cir.1975). Second, a number of the allegations relate to affidavits and testimony of Myrtle Poor Bear in connection with the trials of Leonard Peltier and Richard Marshall. *See United States v. Peltier*, 585 F.2d 314 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *Marshall v. State*, 305 N.W.2d 838 (S.D.1981). Finally, a number of the allegations center around the death of Anna Mae Aquash and the subsequent investigation into it.

### C.

On a motion for summary judgment, the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *Meyers v. Reagan*, 776 F.2d 241, 244 (8th Cir.1985); *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.1984). A party opposing summary judgment is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in the pleadings and affidavits. *Kresse v. Home Insurance Co.*, 765 F.2d 753, 754 (8th Cir.1985). However, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at tri-

al." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *see also Hegg v. United States*, 817 F.2d 1328, 1331 (8th Cir.1987).

### II.

The Supreme Court has provided guidance as to what types of statements may provide a cause of action for libel. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court established a constitutional distinction between fact and opinion, stating:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3006–07 (footnote omitted).

The Court of Appeals recently adopted a four-part test to determine whether a statement is fact or opinion. *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302–03 (8th Cir.) (en banc), *cert. denied*, —— U.S. ——, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986) ("*Janklow II*").[13] The first consideration is the "precision and specificity of the disputed statement;" the more precise a statement is, the more likely it is to be fact. *Id.* at 1302. The second consideration is the verifiability of the statement—"[i]f a statement cannot plausibly be verified, it cannot be seen as a 'fact.'" *Id.* Third is the "literary context" factor which requires consideration of "the category of publication, its style of writing and intended audience." *Id.* at 1303. The statement is to be regarded "as part of a whole, including tone and the use of cau-

---

12. Many of the statements are quite lengthy; some take up an entire page of the book. *See, e.g.,* paragraphs 10a, 10b, 10f.

13. In *Janklow v. Newsweek, Inc.,* 759 F.2d 644, 649 (8th Cir.1985) ("*Janklow I*"), a panel of the court held unanimously that the accurate reporting of a historical fact—that an Indian girl had claimed that she was raped by plaintiff—was not actionable. That holding was not con-

sidered by the en banc court. The panel majority had also ruled that any implication in the Newsweek article that plaintiff prosecuted a case out of revenge was actionable fact. *Id.* at 652. Rehearing en banc was granted "on the question whether the article should be read as fact or opinion," and the en banc majority found the challenged statement to be opinion and therefore nonactionable. 788 F.2d at 1301.

tionary language." *Id.* at 1302.[14] The fourth consideration is the "public context factor;" that is, "the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment." *Id.* at 1303. With regard to this factor, the Court of Appeals explained that "speech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment." *Id.* at 1304 (footnote omitted). The Court of Appeals concluded that "these factors must be considered together, that no solitary criterion can be dispositive, and that ultimately the decision whether a statement is fact or opinion must be based on all the circumstances involved." *Id.* at 1302.

Thus, the four-part *Janklow II* test must be applied to decide that part of defendants' motion which is based on the opinion defense, and the statements must be considered "as part of a whole."

#### A.

The first two factors are specificity and verifiability. Because they are so closely related, they will be considered together.

■ Many of the alleged defamatory statements lack specificity and are unverifiable. For example, paragraph 10u reads:

... Like Myrtle Poor Bear and Angie Long Visitor, like the young Navajo boys bullied into testifying against their leaders, like many others on both sides whose lives have been corrupted to ensure the victory of the United States over Leonard Peltier, this man [Price] on the other end of the wire was only another casualty of the new Indian wars, and he would be soiled for the rest of his days by deeds done in the belief that the end justified the means, whether or not he ever pays a formal penalty.

P. 472. This statement is vague and unverifiable. It is impossible to verify whether plaintiff "would be soiled for the rest of his days by deeds done in the belief that the

end justified the means, whether or not he ever pays a formal penalty." Many of the other statements or portions thereof are similarly vague and unverifiable. *See, e.g.,* Paragraphs 10a (" '[T]here's a lot of aggression [in Price], there's something *mean;* he's a very complex man. Price can be very friendly when he feels like it, and he can also look you in the face and lie—and know you know he's lying—and *still* not show a damned things in his eyes.' " P. 93); 10t ("To judge from his speech, David Price is not a stupid man, but one whose intelligence is severely limited by preconceptions—either that, or he is a liar who not only believes but is angered and moved by his own lies." P. 471). That these statements are vague and unverifiable suggests that they are opinion.

Other statements about which plaintiff complains are somewhat more specific. Some suggest that plaintiff had a role in the presentation of false testimony or false affidavits. For example, paragraph 10c states:

More serious than Louis Moves Camp's lies was the all but inescapable conclusion that Agent Price and perhaps Agent Williams had knowingly prepared this man to give false testimony; at the very least, they found his story so convenient that they had not bothered to find out if it was true.

P. 98. Other statements concerning the testimony of Louis Moves Camp are the basis of paragraphs 10a, 10b, and 10d. A number of statements concern Price's role in obtaining affidavits and testimony from Myrtle Poor Bear. Paragraph 10n contains this portion of the book, for example:

Benson could not or would not see that the two FBI agents who had prepared her testimony in two separate cases, and who knew her well, were at least as aware as Hultman that their witness was unqualified, and that under those circumstances their exploitation of her to ensure Peltier's extradition had been a flagrant example of the misconduct on

---

**14.** Courts have almost uniformly adopted "an approach that analyzes the alleged defamation in the context of the article in which it appears along with the larger social context to which it relates." *McCabe v. Rattiner,* 814 F.2d 839, 842 (1st Cir.1987).

which the defense had built its case. Having decided in the first days of the investigation that Peltier was guilty (the defense declared), the FBI had constructed evidence to fit that theory, and meant to see him convicted by fair means or foul. Once Peltier had been returned to the United States, there was no point in putting that witness on the stand, where her instability might undermine the jury's confidence in the integrity of the U.S. attorneys.

P. 348. *See also* paragraphs 10d, 10o, 10q, and 10w.

It is arguable that some of these statements have the specificity and verifiability required to satisfy the first portions of the *Janklow II* test. Even if this were the case, however, it would not establish that the statements are actionable fact.[15] Instead, all four factors "must be considered together, ... no solitary criterion can be dispositive, and ... ultimately the decision whether a statement is fact or opinion must be based on all the circumstances involved." 788 F.2d at 1302. In *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir.1987), Judge John Minor Wisdom, applying a similar test,[16] viewed the verifiability factor as "a minimum threshold issue." The Fourth Circuit concluded that

> a verifiable statement, a statement that has failed the second *Ollman* factor, nevertheless qualifies as an "opinion" if it is clear from *any* of the three remaining *Ollman* factors, individually or in conjunction, that a reasonable reader or listener would recognize its weakly sub-

stantiated or subjective character—and discount it accordingly.

*Id.* Although the statement in question was verifiable, it was nonetheless opinion because a reasonable reader would recognize that the statement likely reflected the bias of the speaker. *Id.* at 1290.

Thus, even if some of the statements in question pass the specificity and verifiability tests, they must be closely examined with the remaining *Janklow II* factors in mind.

**B.**

■■■ The literary context factor requires examination of the style of writing and tone, considering the statements "as part of a whole." 788 F.2d at 1302. The book has some initial appearance of objective historical reporting. For example, the book contains an extensive bibliography and detailed footnotes for each chapter. A reading of the book, however, reveals that it has a mission of persuasion. The author advocates a new trial for Leonard Peltier. And in Matthiessen's own words, the book "argues and supports the cause of the traditional Indian people and their allies in their long struggle with the U.S. government." P. 577; *see also* p. 460, 462.[17] Matthiessen's sympathies with AIM are evidenced throughout the book. For example, he concludes that AIM's "warrior spirit had restored identity and pride to thousands of defeated people and inspired attempts to resurrect the dying languages and culture." P. xxiv.

---

**15.** The Court of Appeals has noted that "[w]hile allegations of specific criminal conduct generally cannot be protected as opinion, broad brush-stroked references to unethical conduct, even using terms normally understood to impute specific criminal acts, may be understood by the reasonable viewer as opinion." *Lauderback v. American Broadcasting Cos.*, 741 F.2d 193, 197 (8th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985).

**16.** The Fourth Circuit applied the four-part test set forth in *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). *Janklow II* adapted the *Ollman* standard in articulating its test. 788 F.2d at 1302.

**17.** Even in the absence of such explicit acknowledgements, Matthiessen's sympathies would be apparent. For example, Matthiessen adopts the term "goons" that was used by some Indians on the Pine Ridge Reservation to refer to the police force organized by the tribal council president. *See, e.g.*, pp. 70, 73, 250. Matthiessen writes that "[t]he Reservation Murders investigation was concerned only with the killing of the agents; it did not concern itself with the dozens of murders committed in the past three years on the reservation, almost none of which had ever been investigated, far less solved." P. 195. The tone of such writing strongly suggests that Matthiessen identifies with the Indians critical of government policy over this time period.

The book's very title suggests an identification with the Indian position and a powerful quotation from Crazy Horse is presented as a preface to the book.[18] The book is dedicated to "all who honor and defend those people who still seek to live in the wisdom of Indian way." Each chapter begins with a quotation from an Indian, most of which exalt the values of the traditional Indian way of life and deplore the interference of whites with that way of life. Much of the narration is presented in the voices of Indians.[19] The book deals with historical events, but does so from a very pointed perspective.[20] The book's tone and style suggest that the statements in question are opinion.

The fact that the statements were made in a book is relevant. The *Janklow II* court emphasized that the statement in question was published in a national newsmagazine rather than in a daily newspaper. The Court noted that "magazines have a tradition of more colorful, even feisty language, than do dailies," concluding that "the magazine's generally freer style of personal expression and the article's transparently [biased] posture would signal the reader to expect a fair amount of opinion." 788 F.2d at 1304. Books provide an environment for expression far less restrictive than that of a weekly newsmagazine. In a long book which need not report current factual events, an author has the freedom to develop a thesis, conduct research in an effort to support the thesis, and publish an entirely one-sided view of people and events. A reader of such a book not only

expects to find opinion but probably is in active search of opinion; a discussion of history without synthesis and analysis has little intellectual content.

This is a long and rambling book; it has more than 600 pages and is loosely organized. As is stated explicitly numerous times in the book, and as would be apparent to any reader, this book has a thesis and presents a one-sided view of people and events. Its style of writing is often more lyrical than prosaic. Its intended audience is far different from that of, for example, a daily newspaper. With its $20.95 price tag and its sometimes dense presentation, the book's intended audience would likely include students of American Indian history and persons with a specific interest in the events occurring in South Dakota in the 1970's. This audience is more likely to understand the book as opinion than might a broader audience.

In sum, the court finds it almost impossible "that a reader could confuse [*In the Spirit of Crazy Horse*] with purely objective, neutral, straight factual reporting. Its nature, tone and style all indicate opinion." *Saenz v. Playboy Enters., Inc.*, 653 F.Supp. 552, 566 (N.D.Ill.1987).

### C.

■ The *Janklow II* court stated that "speech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment." 788 F.2d at 1304.[21] In

---

**18.** This quotation reads:

We did not ask you white men to come here. The Great Spirit gave us this country as a home. You had yours. We did not interfere with you. The Great Spirit gave us plenty of land to live on, and buffalo, deer, antelope and other game. But you have come here; you are taking my land from me; you are killing off our game, so it is hard for us to live. Now, you tell us to work for a living, but the Great Spirit did not make us to work, but to live by hunting. You white men can work if you want to. We do not interfere with you, and again you say, why do you not become civilized? We do not want your civilization! We would live as our fathers did, and their fathers before them.

Crazy Horse (Lakota)

**19.** For example, the history of Leonard Peltier's life is told almost exclusively through quotations from Peltier. *See* pp. 41–58.

**20.** Though it describes actual events, the tone of the book as a whole cannot be considered "hard news" reporting. For example, the Introduction begins with poetry:

The buffalos I, the buffalos I ...
I am related to the buffalos, the buffalos.
Clear the way in a sacred manner!
I come.
The earth is mine.
The earth is weeping, weeping.

**21.** This view has a long heritage. *See, e.g., Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J.,

finding that the public context factor favored classification as opinion in that case, the court noted that the statements were criticisms of public officials in connection with "an issue of national importance, the treatment of Indian people." *Id.* at 1305.

*In the Spirit of Crazy Horse* contains an enormous amount of this kind of speech, and therefore "implicates core values of the First Amendment." *Id.* at 1303. Indeed, the book contains little else; it considers the history of government policies towards and treatment of American Indians, as well as examining the conduct of government agents involved in Wounded Knee and the reservation murders investigation. It is speech about government and about government officials. It is the "form of speech which the Framers of the Bill of Rights were most anxious to protect." *FCC v. League of Women Voters,* 468 U.S. 364, 383, 104 S.Ct. 3106, 3119, 82 L.Ed.2d 278 (1984). This factor also counsels classification of the statements as opinion.

### D.

▪ The court has carefully considered all of the allegedly defamatory statements still remaining in the case in conjunction with the *Janklow II* factors and the record and finds that they fall into the opinion category. Many of the statements completely lack specificity and verifiability. Although some of the statements are arguably specific and verifiable, the literary and public context factors indicate that the statements must be classified as opinion. A reasonable reader would recognize the subjective character of the statements in the context of the book as a whole. As criticism of government, the statements are entitled to the maximum protection of the First Amendment. They cannot provide the basis for a defamation action.

### III.

Some of the allegedly defamatory statements are actually quotations from persons accusing Price of wrongdoing or are statements that rumors existed to the effect that Price had acted wrongly. For example, paragraphs 10k and 10s state:

> A few days later, Kunstler took this matter up with Agent Price, whom some of the Indians, at least, had suspected of involvement in the killing [of Anna Mae Aquash]....

> Tilsen, who had dealt with Price since the time of Wounded Knee, and knows most of the Indian people Price has dealt with, had no patience with my speculations on this man's blind obedience to the System. "In my opinion, David Price is one of the most corrupt and vicious agents in the FBI...."

Pp. 306, 461. Plaintiff has not disputed the accuracy of these reports; that is, that some Indians did suspect Price and that Tilsen made that statement.[22] Instead, plaintiff argues that reporting the existence of suspicions or such statements is itself actionable and that authors cannot act "as a sort of conduit for untreated sewage of raw rumor." Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment at 3.

▪ The *Janklow I* panel addressed this issue in considering an article in Newsweek magazine that reported that a rape allegation had been made against Governor Janklow at one time. The panel unanimously rejected the possibility of liability on this basis alone, stating:

> To the extent the publication of the rape allegation has caused harm to Janklow's reputation, this harm is the result of a materially accurate report of historical fact, not of an assertion by Newsweek that Janklow committed the alleged crime. Because the publication of a materially true statement is constitutionally protected, *Garrison v. Louisiana,* 379 U.S. 64, 73 [85 S.Ct. 209, 215, 13 L.Ed.2d 125] (1964), and because the article in

---

concurring) (freedom of speech is "means indispensable to the discovery and spread of political truth"); A. Meiklejohn, *Free Speech and Its Relation to Self–Government* (1948).

**22.** Tilsen's statement itself would appear to be opinion insofar as it lacks precision and specificity and is unverifiable.

question cannot be read to imply that Newsweek espoused the validity of the rape allegation, we find no error in the District Court's judgment for Newsweek on this claim.

759 F.2d at 649.[23] Under *Janklow I*, the mere reporting of claims or suspicions which have concededly been published by others is not actionable.[24] Matthiessen's book does not espouse the validity of the suspicions reported. On the contrary, it states: "[D]espite occasional suggestions to the contrary in lurid articles on this case, no one I have talked to makes the serious claim that David Price killed Anna Mae Aquash; all seem to agree that, whoever was responsible for the death, it was an Indian who pulled the trigger." Pp. 445–46. With respect to the reporting of Tilsen's opinion about Price, it cannot be the case that the accurate reporting of an opinion constitutes actionable defamation when one's own statement of that opinion is not actionable.

## IV.

Defendants also move for summary judgment on the ground that plaintiff has failed to make an adequate showing of "actual malice," as required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In determining the standard to be applied to libel claims brought by public officials in *New York Times*, the Supreme Court considered the issue "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 S.Ct. at 721. To this end, the First Amendment requires a rule barring damages for a defamed public official "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 725–26. This showing must be made with "convincing clarity." *Id.* at 285–86, 84 S.Ct. at 728–29.

■ The Court has since amplified the evidentiary standard for actual malice. The "reckless disregard" standard means that there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). And the heightened evidentiary requirement applicable to proof of actual malice—that is, by clear-and-convincing evidence—must be applied in considering summary judgment motions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

### A.

■ The "actual malice" standard applies to defamation actions brought by "public officials." *New York Times*, 376 U.S. at 279, 84 S.Ct. at 726. The parties disagree as to whether Price is a public official in this sense.[25] The precise question of whether an active FBI agent is a public official has not been before the Supreme Court. In *New York Times*, the Court declined "to determine how far down into the lower ranks of government employees the 'public official' designation would extend...." *Id.* at 283 n. 23, 84 S.Ct. at 727 n. 23. Public officials include "at the very least ... those among the

**23.** The parties dispute the weight of *Janklow I* as precedent. Plaintiff argues that the panel decision was vacated by the en banc reconsideration and that it has no precedential value. Defendants assert that the en banc opinion reviewed a limited portion of the panel decision, noting that the en banc decision explicitly left certain of the panel findings undisturbed. 788 F.2d at 1301 n. 2. Since this portion of *Janklow I* was not disturbed by the en banc court, it should remain good authority.

**24.** In an earlier opinion, this court cited authority suggesting defendants could be liable for republication alone. 625 F.Supp. at 645. At that time, the status of *Janklow I* was uncertain; rehearing en banc had been granted, but the en banc court had not yet issued its opinion. *Id.* at 646 n. 10.

**25.** In an earlier opinion, the court only touched on this issue. *See* 625 F.Supp. at 649.

hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966) (footnote omitted). A deputy sheriff has been found to meet the *Rosenblatt* test "at least where law enforcement and police functions are concerned." *St. Amant v. Thompson*, 390 U.S. 727, 730 & n. 2, 88 S.Ct. 1323, 1325 & n. 2, 20 L.Ed.2d 262 (1968). Subsequent cases in the lower courts have consistently found law enforcement officers to be public officials for purposes of the *New York Times* standard. *See, e.g., Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069 (5th Cir.1987); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir.1981) (citing cases); L. Tribe, *American Constitutional Law* § 12–12, at 636 (1978) ("[T]he term 'public official' now embraces virtually all persons affiliated with the government, such as most ordinary civil servants, including public school teachers and policemen.").

First Amendment policy concerns behind the *New York Times* decision favor extending the concept of public official to include FBI agents when acting publicly in the course of their duties. The conduct of such agents in exerting their federal authority is a matter of legitimate public interest. Here, plaintiff and other FBI agents were involved in unusual events and volatile situations on Indian reservations. The public has an interest in learning about law enforcement responses to crises and emergencies and in learning about conditions on the reservations. In this sense, then, plaintiff's conduct touched on "an issue of na-

tional importance, the treatment of Indian people." *Janklow II*, 788 F.2d at 1305. Debate over governmental conduct in such circumstances should be "uninhibited, robust, and wide-open." 376 U.S. at 270, 84 S.Ct. at 721. The public also has a special interest in the integrity of the justice system. Under *Rosenblatt* and the circumstances of this case, the court finds that plaintiff is a public official for purposes of the *New York Times* standard.[26] He therefore has the burden of establishing actual malice by clear and convincing evidence.

### B.

In an attempt to meet their burden of showing that "the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), libel plaintiffs often rely upon circumstantial evidence.[27] Plaintiff relies upon a large number of factors in his attempt to make this showing, including the seriousness of the charges, lack of sources for certain information, obvious reasons to doubt sources, willful failure to consult obvious sources, awareness of inconsistent information, inherent improbability, lack of deadline pressure, and failure to verify information following denials.[28] Plaintiff also argues that Matthiessen's agreement to share his royalties with the Leonard Peltier Defense Committee gave him a motive to publish falsehoods which is relevant to a determination of actual malice. Finally, plaintiff asserts that "collateral falsehoods"—false statements of fact unrelated to plaintiff—are probative of the

---

**26.** All of the alleged defamatory statements concern acts of plaintiff in his law enforcement capacity or perceptions of persons he encountered in that capacity. As such, they must be considered in the context of the First Amendment's emphasis on protecting criticism of official conduct. Different considerations would be relevant if the statements had concerned private conduct.

**27.** Plaintiff argues that direct evidence of subjective doubt exists in this case, relying upon statements by Matthiessen in his deposition that he did not believe all of the rumors he reported in the book. These rumors were reported as rumors, however, rather than as true statements

asserted by the author himself. The existence of a rumor can be an important historical fact. Because plaintiff does not question the existence of the rumors, he is not asserting that their accurate reporting is a false statement. Such reports are not actionable as mentioned *supra* at 1510–1511. Matthiessen's statement of disbelief in the rumors is not evidence of actual malice where the rumors are relevant to other text.

**28.** In large part, plaintiff applies the factors in the framework discussed in Bloom, *Proof of Fault in Media Defamation Litigation*, 38 Vand. L.Rev. 247 (1985).

author's reckless state of mind with respect to statements about him.

■ The record indicates that Matthiessen took considerable care in writing the book. He circulated his manuscript among knowledgeable persons, solicited their criticisms, and made corrections where he considered it appropriate. He recognized that several of his sources of information might reflect a pro-Indian, anti-government bias and sought out other viewpoints. He interviewed plaintiff, and devoted twelve pages of the book to that interview, in which Price expresses his view on many of the events in question. Pp. 461–72. He attempted to interview former United States Attorney Evan Hultman, but Hultman refused. Pp. 497–98. Viewed in the light most favorable to plaintiff, however, the facts may suggest that Matthiessen was careless in writing certain portions. The quality of the book could well have been improved by an additional editing. Negligence, however, "is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." *New York Times*, 376 U.S. at 288, 84 S.Ct. at 730; *see also Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir.1987) ("[A] negligent failure to investigate does not itself establish recklessness for purposes of a libel suit.").

■ Plaintiff places great emphasis on Matthiessen's agreement with the Defense Committee. But the discovery of this agreement does no more than reinforce the already apparent one-sidedness of the book. The book argues for a new trial for Leonard Peltier. Like a legal brief or a political tract, it is not a neutral description of events. Matthiessen's affiliation with the Defense Committee does not make it more likely that he had serious doubts as to the truth of his publication. In fact, his willingness to donate a portion of the book's royalties could evidence his sincere belief in the cause he promoted and the words he wrote, but on this motion the court will not draw such an inference. That the book is one-sided does not show actual malice: "The deliberate choice of [one of a number of possible rational interpretations] ... [is]

not enough to create a jury issue of 'malice' under *New York Times.*" *Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971).

■ The court finds little or no support for plaintiff's argument that "collateral falsehoods" may provide a basis for inferring actual malice. As the District of Columbia Circuit recently held, "defamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement." *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C.Cir.) (en banc) (emphasis in original), *cert. denied*, — U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). Accordingly, even if Matthiessen had subjective doubts about, for example, the mineral deposit conspiracy theory, this would not establish an inference of actual malice with respect to his statements concerning plaintiff. The doubt must be in conjunction with the alleged defamatory statement.

■ Finally, even a superficial investigation reveals that some of the allegedly defamatory statements are not false. For example, paragraph 10w reads:

... And since Marshall's continuing appeal is essentially based on FBI misconduct involving the same witness [Myrtle Poor Bear] whose false affidavits ensured Leonard Peltier's extradition from Canada, the outcome of his case is bound to affect Peltier's own chance for a new trial.

P. 476. In *United States v. Peltier*, 585 F.2d 314 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979), the Court of Appeals noted that "[t]he use of the affidavits of Myrtle Poor Bear in the extradition proceedings [of Peltier] was, to say the least, a clear abuse of the investigative process by the F.B.I. This was conceded by government counsel on the hearing in this court." *Id.* at 335 n. 18. Substantial portions of paragraph 10d and other statements concerning Myrtle Poor Bear find support in former Chief Justice Wollman's dissent in *Marshall v. State*, 305 N.W.2d 838, 843 (S.D.1981). Actual malice requires both that the defamatory publication be false and that its au-

thor entertained serious doubts as to its truth. *See Tavoulareas v. Piro*, 817 F.2d at 775–76. To the extent that the statements were not false, there can be no actual malice.

After considering all of the evidence presented by plaintiff with respect to defendants Matthiessen and Viking, the court finds that it "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). As such, no genuine issue of material fact remains, and defendants are entitled to summary judgment.[29] *Id.; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### V.

■ Defendants also seek dismissal on an additional basis in their so-called *"Fitzgerald"* motion. Defendants made this "cross motion" in response to the federal government's motion for a protective order with respect to the deposition of plaintiff. United States Magistrate Floyd E. Boline granted the government's motion on November 21, 1986 and issued an order prohibiting plaintiff from disclosing the identity of any FBI informant under the common law informer's privilege and preventing inquiry into grand jury proceedings pursuant to Fed.R.Crim.P. 6(e). Relying almost exclusively upon *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236 (4th Cir.1985), defendants argue that the Magistrate's order prevents them from having a fair opportunity to defend plaintiff's claim and therefore requires dismissal of the action.[30]

*Fitzgerald* involved an article published in Penthouse Magazine which asserted that a scientist, who did work with dolphins for the CIA and the Navy for military and intelligence purposes, sold "dolphin torpedoes" to other countries. Plaintiff scientist alleged that the article libelously charged him with espionage. When plaintiff identified a Navy employee who would testify that he had not disclosed any classified information, the Navy intervened in the case and moved to dismiss on the ground that the trial would lead to the disclosure of privileged state secrets. Finding that "the very subject of this litigation is itself a state secret," and that "no amount of effort and care on the part of the court and the parties will safeguard [the] privileged material," the court affirmed the dismissal of the action. 776 F.2d at 1243, 1244.[31]

The court is not persuaded, however, that *Fitzgerald* should lead to dismissal of this action. First, it is not at all clear that the holding extends beyond contexts involving military or state secrets privileges to encompass other privileges. Second, the

---

**29.** Plaintiff asserts that the court cannot grant summary judgment for defendants at this time, arguing that he is entitled to "a full opportunity to conduct discovery," *Anderson*, 106 S.Ct. at 2514, and that discovery has not yet been completed. Discovery was conducted over a period in excess of one year, however, and plaintiff opposed defendants' September 9, 1987 motion to extend the discovery deadline. Plaintiff has had a full opportunity to conduct discovery as required by *Anderson*, and summary judgment at this time is appropriate under all the circumstances.

Because the complaint should be dismissed, plaintiff's motions to compel discovery and for sanctions covering the costs of further discovery are moot.

**30.** Defendants argue that the complaint focuses on allegations that plaintiff failed to investigate fully various matters, such as the identity of Anna Mae Aquash's body, the truth of Louis Move Camp's testimony, and the truth of Myrtle Poor Bear's affidavits. In order to establish the truth of these assertions as their defense, defendants contend that they must know whether plaintiff questioned all persons with relevant information, including FBI informants. Because the Magistrate's order prohibits defendants from discovering the identity of FBI informants from Price, defendants argue that plaintiff's claims cannot be fairly litigated.

**31.** The *Fitzgerald* court relied, in part, upon an earlier Fourth Circuit decision, *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir.1980) (en banc). In that case, the court upheld the dismissal of a tortious interference claim against a Navy employee, finding that "any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation." *Id.*

*Fitzgerald* court carefully limited its holding to situations in which "the very subject of [the] litigation is itself" privileged. 776 F.2d at 1243. Here, by contrast, the information sought by defendants would be helpful, but is not itself the subject of the litigation. In addition, *Fitzgerald* stressed that dismissal should only be a last resort. *Id.* at 1243–44. Defendants have not shown here that they have been denied discovery necessary for the fair litigation of the claims against them. Finally, defendants' Fourth Circuit precedent may be distinguished on the ground that the government intervened as a party in *Fitzgerald* and served as counsel for defendant in *Farnsworth Cannon.* The government has taken no such role in this litigation. For these reasons, this basis for dismissal should be denied.

## VI.

This litigation has gone on a long time. Plaintiff has had ample opportunity for discovery and to establish an actionable case, but defendants have shown they are now entitled to summary judgment. Plaintiff appears from time to time in this court as a dedicated public servant and is understandably distressed by portions of *In the Spirit of Crazy Horse.* But it is not for this court to balance his distress with the right to freedom of speech vigorously asserted by defendants. The Supreme Court has already struck that balance with respect to public officials, and in the absence of clear and convincing evidence of actual malice with respect to a statement of fact concerning plaintiff, the balance tips in favor of free speech. For all the reasons previously discussed, this action should be dismissed.

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. The motions of defendant Viking Penguin, Inc. and Peter Matthiessen for summary judgment are granted, and the complaint is dismissed.

2. Plaintiff's motions to compel discovery and for sanctions are dismissed as moot.

3. The counterclaim of defendant Ellison is dismissed without prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.