William JANKLOW, Appellant,

v.

NEWSWEEK, INC., Appellee.

No. 84–1452.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1985.

Decided April 10, 1986.

Joseph M. Butler, Rapid City, S.D., for appellant.

Lawrence L. Piersol, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN and WOLLMAN, Circuit Judges, en banc.

ARNOLD, Circuit Judge.

William Janklow, the Governor of South Dakota, filed this defamation action against *Newsweek* magazine based on an article in the weekly's February 21, 1983, issue about American Indian activist Dennis Banks. The article, "Dennis Banks's Last Stand," purports to give a history of the relationship between Banks, who fled the state in the mid-1970's after his conviction on two felony counts, and Janklow, who while Attorney General prosecuted

Banks and later, as Governor, sought his extradition. Janklow's claim centers on one paragraph of the article, which referred to Banks's 1974 initiation of tribal charges of assault against Janklow, in connection with an allegation (now acknowledged to be false) that the plaintiff had raped a teenaged Indian girl five years before.

The District Court[1] granted summary judgment for the defendant magazine. The court held that *Newsweek* correctly reported the material facts of the rape allegation, that the article did not suggest the magazine believed the truth of the allegation, and that any implication that revenge motivated Janklow's prosecution of Banks was opinion and therefore nonactionable under the First Amendment.

On appeal, a divided panel of this Court upheld the first two holdings[2] but reversed the third on the ground that "the meaning that can be drawn from the *Newsweek* article—that Janklow did not commence prosecuting Banks until after Banks attempted to bring him to justice for the alleged rape of an Indian girl—is factual." *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 652 (8th Cir. 1985). The panel's holding was based on four factors. The panel found that the language of the article was, on the whole, that of a factual account; that the forum—a weekly newsmagazine—was likely to be considered as offering "hard" news; that the article's implication was not "broad, unfocused or subjective" but rather a "specific factual assertion," *id.* at 652; and finally, that no cautionary language was used to signal to the reader that opinion, and not fact, was being presented. We granted defendant's petition for rehearing en banc on the question whether the article should be read as fact or opinion. We now hold it to be opinion, absolutely protected by the First Amendment, and therefore

1. The Hon. John B. Jones, United States District Judge for the District of South Dakota.

2. These holdings of the panel were not reconsidered by the Court en banc and therefore remain in effect. See *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 647–49 (8th Cir.1985). Because of our decision on the fact/opinion question, it is unnecessary for us to consider the issues discussed in Part IV of the panel opinion, *id.* at 653–54.

affirm the judgment dismissing the complaint with prejudice.

## I.

 Opinion is absolutely protected under the First Amendment. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). But it is hard to draw a bright line between "fact" and "opinion." There is a sense in which one's intention or motive in performing a certain act is properly categorized as "fact." Whether someone accused of mail fraud, say, had criminal intent is a question of "fact" to be decided by the jury in a criminal prosecution. Whether someone promising to perform a contract actually had no intention of doing so is a "fact" that, in some jurisdictions, will support a civil action for fraud. And in this sense, whether Governor Janklow prosecuted the case against Banks for revenge, or out of a genuine sense of duty, is a question of "fact." But the term "fact" need not have the same meaning in every legal context. The meaning we give to it should depend on the purposes of the law being applied. Here, that law is the First Amendment, which in the most uncompromising terms ("Congress shall make no law ...") seeks to protect freedom of speech.

 In establishing the criteria by which to judge "Dennis Banks's Last Stand," we have looked at how a variety of courts have handled the fact/opinion distinction since its importance was made clear in *Gertz*.[3] Recently, the issue was thoroughly ventilated by the District of Columbia Circuit, *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir. 1984) (en banc), *cert. denied*, — U.S. —, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), and we choose here to adopt the four factors suggested in Judge Starr's scholarly opinion, and to expand them, for reasons we will explain, to include elements of the concurrence by Judge Bork. We emphasize, however, that these factors must be considered together, that no solitary criterion can be dispositive, and that ultimately the decision whether a statement is fact or opinion must be based on all the circumstances involved. See *Ollman*, 750 F.2d at 1060 ("important these factors not be taken mechanically") (MacKinnon, J., concurring).

The first relevant factor identified in *Ollman* was the precision and specificity of the disputed statement, 750 F.2d at 981, a concern found in many fact/opinion cases. See, *e.g.*, *Buckley v. Littell*, 539 F.2d 882 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977) (calling someone a "fascist" was indefinite and therefore opinion, while comparing him to a known libeller was specific and so fact). It is difficult to call a vague or imprecise statement a "fact"; in the present context, moreover, doing so would place the First Amendment at the mercy of linguistic subtleties and fourth-ranked dictionary definitions.

Tied to the concept of precision is that of verifiability. If a statement cannot plausibly be verified, it cannot be seen as "fact." *Id.* A statement regarding a potentially provable proposition can be phrased so that it is hard to establish, or it may intrinsically be unsuited to any sort of quantification. See *Mr. Chow of New York v. Ste. Jour Azur*, 759 F.2d 219, 226 (2d Cir.1985).

A third factor is the literary context in which the disputed statement was made. The statement must be taken as part of a whole, including tone and the use of cautionary language. *Ollman*, 750 F.2d at 982–83; see also *Gregory v. McDonnell*

---

3. See, *e.g.*, *Mr. Chow of New York v. Ste. Jour Azur*, 759 F.2d 219 (2d Cir.1985); *Redco v. CBS*, 758 F.2d 970 (3d Cir.1985); *Lauderback v. American Broadcasting Co., Inc.*, 741 F.2d 193 (8th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied*, — U.S. —, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Lewis v. Time, Inc.*, 710 F.2d 549 (9th Cir.1983); *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir.1980); *Strada v. Conn. Newspapers*, 193 Conn. 313, 477 A.2d 1005 (1984); *Marchiondo v. Brown*, 98 N.M. 394, 649 P.2d 462 (1982); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied*, 434 U.S. 969, 98 S.Ct 514, 54 L.Ed.2d 456 (1977); *Gregory v. McDonnell Douglas Aircraft Corp.*, 17 Cal.3d 596, 131 Cal.Rptr. 641, 552 P.2d 425 (Cal.1976).

*Douglas Corp.*, 17 Cal.3d 596, 131 Cal. Rptr. 641, 552 P.2d 425, 428 (Cal.1976). We include as well under the rubric of literary context the type of forum in which the statement was made, a factor which Judge Starr called "social context." *Ollman*, 750 F.2d at 983. This factor focuses on the category of publication, its style of writing and intended audience.

Finally, in deciding whether a statement is fact or opinion, a court must consider what we will call the "public context" in which the statement was made. It is true that the distinction between public and private figures which bears so heavily in many libel cases has no direct relevance here, see, *e.g., Ollman*, 750 F.2d at 975; *no* opinion is actionable, whether it concerns a private person or a public figure. However, when determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment. See *Ollman*, 750 F.2d at 1002–05 (Bork, J., concurring). In fact, as Judge MacKinnon recognized, "Judge Bork's skillful employment of 'the concept of a public, political arena' is crucial to a proper understanding of the analysis Judge Starr elucidates." *Ollman*, 750 F.2d at 1016 (MacKinnon, J., concurring).

With these factors in mind, we turn to the disputed statement in this appeal.

## II.

The eight-paragraph *Newsweek* article [4] began with an account of Dennis Banks's flight from California shortly before he could be extradited to South Dakota, described as an escape from "the clutches of his nemesis," Governor Janklow. The piece continued by recounting Banks's activities in the American Indian Movement, including his involvement in the 1973 riot at the Custer County, South Dakota, courthouse in which several police officers were

**4.** The full text of the article is set out as an appendix to the panel opinion, 759 F.2d at 654–56.

hurt. The third paragraph then told readers:

Along the way, Banks made a dangerous enemy—William Janklow. Their feud started in 1974, when Banks brought charges against Janklow in a tribal court for assault. A 15-year-old Indian girl who baby-sat for Janklow's children had claimed that he raped her in 1969. Federal officials found insufficient evidence to prosecute, but Banks persuaded the Rosebud Sioux chiefs to reopen the case under tribal law. Janklow, who was running for election as state attorney general at the time, refused to appear for the trial. But the tribal court found "probable cause" to believe the charges and barred Janklow from practicing law on the reservation. Eight months later Janklow—who had won his election despite the messy publicity—was prosecuting Banks. And his case—based on the 1973 Custer riot—was successful. Found guilty of riot and assault without intent to kill, Banks jumped bail before sentencing.

According to Janklow, the article defames him by implying that he began prosecuting Banks in revenge for the instigation of the tribal charges, when in fact Janklow, serving as special prosecutor, had initiated proceedings against Banks prior to the resurrection of the rape allegation and merely continued that prosecution as Attorney General.

Our analysis begins with the question of precision. The statement (that plaintiff "was prosecuting Banks" eight months after the tribal court's unfavorable finding) is not precise. It does not say in so many words that Janklow's motive was revenge. It does not say in so many words that the prosecution was commenced after the tribal court's decision. It certainly does not suggest that Banks had done nothing to warrant prosecution for riot and assault. It says only that the prosecution was going on eight months after the tribal court's

decision, and no one can deny that that is true. The imputation of improper motive must be drawn from this sentence in the article by implication. The sentence is not nearly so precise as a direct accusation of improper motive.

■ Of particular concern is *why* this statement is imprecise. At bottom, we face a question of usage; had *Newsweek* changed a single word and said the plaintiff *"continued* prosecuting" Banks, the implication of revenge would be more difficult to draw, and there would not even be an arguable misstatement of underlying fact. Janklow argues that it is precisely because *Newsweek* could have written a clearer sentence that the statement is actionable. We disagree. We believe that the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words. See *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Editors' grilling of reporters on word choice is a necessary aggravation. But when courts do it, there is a chilling effect on the exercise of First Amendment rights.

The second factor is verifiability. Janklow says it is "absolutely verifiable" that his prosecution of Banks was not born out of revenge, Appellant's Supplemental Brief at 23, because the riot prosecution began before Banks renewed the rape charge. While chronology makes it undeniable that retribution for what happened in 1974 could not motivate events in 1973, plaintiff's reading of the paragraph is not the only plausible one. It could also be seen as implying that as Attorney General, Janklow pressed the prosecution he began as special prosecutor in order to obtain revenge, personally handling the case when he prudently might have recused himself. And this implication would be difficult to prove, for unlike the rape allegation at issue in *Cianci v. New Times Publishing Co,* 639 F.2d 54 (2d Cir.1980), the singling out of impermissible motive is a subtle and slippery enterprise, particularly when the activities of public officials are involved. See, *e.g., Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

As for the literary context of the statement, the panel opinion was influenced by the fact that "Dennis Banks's Last Stand" did not appear on the Op-Ed page of a newspaper, *Janklow v. Newsweek, Inc.,* 759 F.2d at 651, as did the column in *Ollman.* However, it would be a mistake rigidly to denominate some publications or pages as those dealing only with fact and others as dealing only with opinion. While the whole of the *Newsweek* article could not be classified as opinion or criticism, see *Mr. Chow of New York v. Ste. Jour Azur,* 759 F.2d 219 (2d Cir.1985), national newsmagazines nevertheless are not the same as local daily newspapers. The magazines have a tradition of more colorful, even feisty language, than do dailies; they are also required to condense to a few paragraphs those issues to which local papers devote days of coverage and thousands of inches of space. See Gans, Deciding What's News 4–5 (1979). Here, the magazine's generally freer style of personal expression and the article's transparently pro-Banks posture would signal the reader to expect a fair amount of opinion.

■ Finally, we look at the public context in which this statement was made. Certainly, speech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment.[5] See *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.3d 943, 366 N.E.2d 1299, 1306, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977) (citing the importance in the fact/opinion context of "the free flow of information to the people concerning the performance of their public officials"). See also *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 504 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Sweeney v. Patterson,* 128 F.2d 457, 458 (D.C.Cir.),

---

5. We agree with Judge Bork that those who participate willingly in public debate "must accept a degree of derogation that others need not," *Ollman,* 750 F.2d at 1002.

*cert. denied,* 317 U.S. 678, 63 S.Ct. 160, 87 L.Ed. 544 (1942); *Schaefer v. Lynch,* 406 So.2d 185 (La.1981). It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials. Here we have criticism of the conduct of a state attorney general who now serves as governor, as well as questions about the actions of three other governors of two other states, all involving an issue of national importance, the treatment of Indian people. Few other discussions of public concern could make a greater claim for First Amendment protection.

■ Because the disputed statement in this case is imprecise, unverifiable, presented in a forum where spirited writing is expected, and involves criticism of the motives and intentions of a public official, we affirm the holding of the District Court that it is opinion, protected by the First Amendment.[6]

### III.

■ The plaintiff argues that even if the statement in *Newsweek* is to be read as opinion,[7] it is still actionable, on grounds that the magazine deliberately distorted the chronological sequence of events to suggest retribution as the motivation for the prosecution of Banks. As support, Janklow cites this Court's decision in *Lauderback v. American Broadcasting Co.,* 741 F.2d 193, 195 (8th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985), in which we held that "statements clothed as opinion which imply that they are based on undisclosed, defamatory facts are not protected" by the First Amendment.[8] Therefore, plaintiff says, a publisher also may not "disclos[e] 'facts' which he knows to be false to support his defamatory opinion," Appellant's Supplementary Brief at 4, or omit facts "which would substantially alter the average reader's opinion," *Lauderback,* 741 F.2d at 198.

■ The situation in this case differs from that in *Lauderback,* where the television network was charged with having implied that the plaintiff either had been or was about to be indicted for insurance fraud. Nor is it similar, except superficially, to the facts of *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980); there, not only was the chronology blurred in the account of a public official charged

---

6. We do not hold that only accusations of actual criminal conduct against public officials are actionable as fact under the First Amendment. While these four factors (particularly those of precision and verifiability) might best be met by criminal allegations, the concept of actionable fact is not limited to allegations of crime, either for private citizens or public officials.

7. At oral argument before the Court en banc, plaintiff for the first time asked that we hold that close fact/opinion questions should go to the jury as trier of fact rather than be decided by the court as questions of law. We reject this suggestion. The "overwhelming weight of post-*Gertz* authority [is] that the distinction between opinion and fact is a matter of law," *Ollman,* 750 F.2d at 978; see also *Lauderback,* 741 F.2d at 196 n. 6, and for good reason. Plaintiff cites two cases which argue, contrary to the majority of decisions, that an "ambiguous comment * * should be left to the jury," *Nevada Indep. Broadcasting Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337 (1983); see also *Good Gov't Group of Seal Beach, Inc. v. Superior Court,* 22 Cal.3d 672, 150 Cal.Rptr. 258, 586 P.2d 572 (1978), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). We believe instead that because such

questions generally tend to be problematic and involve important First Amendment issues, they remain within the province of the trial court, which in any event would be asked to review any jury decision for plaintiff at the end of trial.

8. *Lauderback* reflects the scheme set out in Restatement (Second) Torts § 566, which provides that:

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

We agree with the District of Columbia Circuit that the significant considerations raised by § 566 are "not distinct from the general evaluation of whether a statement constitutes fact or opinion," *Ollman,* 750 F.2d at 985 n. 29, and that "the tests already articulated are a sufficient aid in determining whether a statement implies the existence of undisclosed facts," *id.* at 985. As Judge Starr explains, the inquiry into precision and verifiability covers the possibility that a statement conveys factual implications while the discussion of literary context includes an examination of how a reader might approach the statement.

with rape, but the description of events inexorably led to a conclusion of fact—that the plaintiff had paid his alleged victim $3,000 to drop her charges when, in fact, the payment was made after the criminal charges had been dropped in order to settle a civil suit. *Id.* at 58. (" 'For the nominal sum of $3,000, Cianci managed to buy his way out of a possible felony charge.' ") No such direct suggestion of fact was made here. The implication Janklow complains of here comes from semantic ambiguity, not from false statements made by *Newsweek.* As we said above, this Court will not make editorial judgments about specific word choice in order to portray a plaintiff in the best possible light, particularly when the "sting" of the implication— that Janklow acted vengefully towards Banks—is still present when the full chronology is laid out.

▇ Every news story (like every judicial opinion) reflects choices of what to leave out, as well as what to include. We can agree that this story would have been fairer to Janklow and more informative to the reader if the chronology of the rape charge against Janklow and the riot prosecution against Banks had been more fully explained. Certainly there can be omissions serious enough to take what is ostensibly an opinion and convert it into a fact for legal purposes. We have attempted to explain why this particular omission does not rise to that level. Courts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government.

We return in conclusion to our initial point: that both in establishing the standards by which opinion is distinguished from fact, and in measuring a particular

statement against those standards, we are dealing with First Amendment rights, among the most precious enjoyed by Americans. Accordingly, the judgment of the District Court is

Affirmed.

BOWMAN, Circuit Judge, joined by ROSS and FAGG, Circuit Judges, dissenting.

Because I do not agree that the Court's decision strikes a fair balance between the media interests represented by Newsweek and the individual interests represented by Janklow, I respectfully dissent.

Since 1964, the press has enjoyed the benefit of the Supreme Court's decision in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which bars a public official injured by a defamatory publication from any judicial remedy unless the official can prove not only that the material was false, but also that it was published with actual malice. *See Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). The plaintiff must make a strong showing of actual malice if the case is to survive a motion for summary judgment and get to the jury. *See Brown v. Herald Co., Inc.,* 698 F.2d 949 (8th Cir.1983) (per curiam); *cf. Bose Corp. v. Consumers Union, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Actual malice in the libel context is difficult to prove, and very few libel plaintiffs have succeeded in making the requisite showing. Since *Sullivan,* publishers have enjoyed both in theory and in practice a very high degree of protection from liability for material defamatory of public officials and other persons found to be public figures. *See, e.g., Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.1980). This judicially created limitation on libel actions has, interestingly enough, no apparent relationship to any change that has occurred in either the Constitution or society since the Bill of Rights was ratified in 1791.[1] Libel

---

1. The adoption of the First Amendment was largely a response to the English government's suppression of ideas in the prerevolutionary pe-

riod by the exercise of seditious libel laws and prior restraints. Needless to say, the present action neither is criminal in nature nor operates

is still libel. All that has changed is the prevailing judicial perception of where the balance should be struck between libel plaintiffs and libel defendants, who in our time are frequently large media organizations such as Newsweek.

Today's decision tips the balance still farther in the media's favor. To the fortress of actual malice, the Court adds a virtually impenetrable outer barrier built upon an extremely broad and elastic definition of opinion. Because opinion is not actionable, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), the result is that many libel cases (and probably almost all libel cases in which the plaintiff is a public official) will be dismissed before the issue of actual malice is ever reached. I find it hard to believe that this is what Justice Powell had in mind when he penned his famous dictum in *Gertz* that "[u]nder the First Amendment there is no such thing as a false idea." *Id.* Ideas are one thing, but tawdry attacks on character and reputation are another.[2] I do not see any reason to extend absolute protection under the First Amendment to statements that qualify as opinion rather than fact only by means of

judicial semantics based on the *Ollman* factors.

For the reasons set forth in the panel opinion in this case, I believe that the meaning that a jury could draw from the Newsweek article here at issue—that Janklow prosecuted Banks because Banks had resurrected a 15-year-old Indian girl's claim that Janklow had raped her—amounts to an assertion of fact rather than an expression of opinion. *See Janklow v. Newsweek, Inc.,* 759 F.2d 644, 649–652 (8th Cir.1985). The panel opinion includes my analysis of the *Ollman* factors as applied to the present case, and I will not burden this dissent by repeating that analysis here or by nitpicking the Court's present discussion of those factors. Beauty is in the eye of the beholder, and it would appear that the result to be obtained through application of the *Ollman* factors is in the eye of the judge. Clearly those factors do not yield predictability, unless the prediction is that their application almost always will result in keeping defamation actions brought by public officials and public figures from reaching a jury.

I would not carry judicial absolutism this far. After all, the Constitution includes

as a prior restraint. Rather, Janklow merely seeks a remedy for the injury to his reputation resulting from Newsweek's publication of a defamatory article. Blackstone's view of libel, contemporaneous with that of the Founding Fathers, provides an interesting contrast to the position adopted in *Sullivan.* In commenting upon what constitutes freedom of the press in criminal libel actions, surely equally applicable to civil actions brought by an individual, Blackstone noted:

The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no *previous* restraints upon publications.... Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity.... Thus the will of individuals is still left free; the abuse only of that free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or enquiry: liberty of private sentiment is still left; the disseminating, or making public, of bad sentiments, destructive of the ends of society, is the crime which society corrects.

IV W. Blackstone, *Commentaries on the Laws of England* 151–52 (The Layston Press, 1967) (reproduction of 1st American edition, 1772). Similarly, Thomas Jefferson believed in the importance of a free press, but according to his leading biographer

His advocacy of freedom for the press was subject to certain qualifications. He believed that falsehood and defamation could and should be punished under state laws.

D. Malone, *Jefferson The President—Second Term 1805–1809* 9 (Little, Brown and Company 1974). *See also* R. Epstein, *Takings* 86 (Harv. Univ.Press 1985) (defamation actions weighted in favor of plaintiffs prior to *Sullivan* ); *Ollman v. Evans,* 750 F.2d 970, 1038–39 & nn. 1–2 (D.C. Cir.1985) (Scalia, J., dissenting).

**2.** Justice Powell illustrated the sort of idea that never can be false by reference to Thomas Jefferson's Inaugural Address, in which Jefferson stated: "If there be any among us who would wish to dissolve this Union or change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." 418 U.S. at 340 n. 8, 94 S.Ct. at 3007 n. 8.

the Seventh Amendment as well as the First. Moreover, it seems clear to me that the Bill of Rights exists to protect individuals from the various forms of tyranny that were well known to the Framers, not to sanction cheap attacks upon the dignity and sanctity of the individual for the sake of gauzy philosophical abstractions such as "editorial judgment." As the Court notes, *ante* at 1306, First Amendment rights are among the most precious enjoyed by Americans, but that does not answer the question of how far those rights should go at the expense of other rights. Also precious is the right to obtain legal redress for injury to one's person or property, including injury to reputation, caused by the wrongdoing of another. The latter right is especially compelling, both legally and ethically, when the injury-causing act can be shown to have been done with actual malice, as First Amendment jurisprudence currently requires in regard to public officials and public figures. What is called for, it seems to me, in cases raising the fact/opinion issue, is a thoughtful balancing of the competing interests, not the nearly total subordination of the individual's reputational interest to the media's desire for immunity from accountability to individuals harmed by defamatory material published with actual malice.

The Court's decision means that we never shall know whether Janklow would have been able to make a submissible case on the issue of actual malice. The indications, however, are that he would have made a strong showing on that issue. For example, there is evidence in the record that, prior to publication, Newsweek was aware that Janklow was prosecuting a number of the Custer riot cases before Banks brought up the rape allegation. There is also evidence in the record that Newsweek was aware that Banks, wishing to avoid successful prosecution by Janklow, had a motive for derailing Janklow's candidacy for attorney-general. Moreover, Janklow argues in his brief that Banks himself specifically told Newsweek that Janklow was prosecuting him before he brought up the rape allegation. Janklow also argues in his

brief that the manner in which the article evolved during the editorial process provides evidence of actual malice. He contends, and apparently would have been prepared to show, that as the article progressed from initial draft to final form, the portrait of Janklow as a vindictive and bigoted racist grew more and more vivid. He points out that one of the Newsweek reporters who worked on the Banks story stated in a deposition that the article was "outrageous" and that Newsweek had in fact done "a job on him and we also riddled it with errors." (Foote deposition at 83). These facts, if shown by clear and convincing evidence, could easily be taken by a jury, it seems to me, as demonstrating "a high degree of awareness of ... probable falsity" of the assertion that Janklow initiated Banks's prosecution for revenge. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (quoting *Garrison v. Louisiana*, 379 U.S. at 74, 85 S.Ct. at 216).

The Court suggests that the change of a single word in the article would have yielded a piece without even an arguable misstatement of underlying fact. *See ante* at 1304. But this really begs the question at hand, for all libel actions turn in one way or another on simply that—word choice. The question here is not whether courts will be making editorial judgments about these specific word choices but rather whether Newsweek will be held accountable for its editorial judgments, *i.e.*, for the words that it does choose. Moreover, considering the carefully crafted nature of the article and its blatant anti-Janklow bias, this aspect of the Court's opinion strikes me as being disingenuous.

Judge Arnold has remarked that "the article as a whole is tendentious and slanted. It is transparently pro-Banks." 759 F.2d at 657 (Arnold, J., dissenting). The District Court, in its memorandum opinion granting Newsweek's motion for summary judgment, expressed its "sense of outrage at the unfairness of the article." *Janklow v. Newsweek, Inc.*, No. 83–4023, slip op. at

7 (D.S.D. Mar. 29, 1984). The District Court also had this to say about the article:

> Rape is one of society's most reprehensive crimes. The claim of rape referred to by Newsweek was made over fifteen years earlier, and was investigated at that time by federal law enforcement officials who found insufficient evidence to prosecute. It was investigated again in 1975 by the F.B.I., the White House, and the Senate Judiciary Committee when Janklow, then the Republican Attorney General of South Dakota, was nominated for a position on the board of the Legal Services Corporation. The Senate Judiciary Committee was composed of, among others, Senators Ted Kennedy, Walter Mondale and Allen Cranston, none of whom have [sic] any reputation for whitewashing misdeeds of Republican officeholders. The F.B.I., the White House and the Senate Judiciary Committee determined that the rape claim was unfounded and without any factual basis. When Newsweek ran as a news item this thoroughly discredited, fifteen-year-old claim against the defendant, now Governor of South Dakota, it engaged in journalistic conduct more commonly associated with tabloids like the National Enquirer and the Globe.

*Id.* at 7–8.

The issue, of course, is not whether the article is unfair. It is, and conspicuously so. The issue is not whether the implication that the article invites—that Janklow's prosecution of Banks was motivated by a desire for personal revenge—is defamatory. Clearly it is. The issue is whether this quite precise implication, readily derived from a precisely stated factual scenario, should be deemed a statement of fact or a statement of opinion. I see no good reason to distort the commonly understood meaning of a perfectly good and useful word by cloaking in the Constitutionally protected mantle of "opinion" this precise and factually based implication. To the contrary, an implication that Janklow prosecuted Banks for personal revenge is hardly the sort of idea best illuminated through public debate. It is rather a charge of serious misconduct, and as such it is ideally suited for judicial resolution. I believe that what Judge Friendly said of the charges at issue in *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir.1980), is equally applicable here.

> To call such charges merely an expression of 'opinion' would be to indulge in Humpty-Dumpty's use of language. We see not the slightest indication that the Supreme Court or this court ever intended anything of this sort and much to demonstrate the contrary.

639 F.2d at 64.

I would reverse this case and remand it to the District Court for further proceedings consistent with the panel opinion.