**James E. SECRIST, Appellant,**

v.

**Tom HARKIN, United States Senator; Pam McKinney; John Frew; Citizens for Harkin, Appellees.**

No. 88–2327.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1989.

Decided May 9, 1989.

Arthur Hanson, Washington, D.C., for appellant.

W. Randolph Teslik, Washington, D.C., for appellees.

Before WOLLMAN and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

In the summer of 1983, appellant James E. Secrist was assigned to Senator Roger W. Jepsen's personal office staff. At the time of his assignment, Secrist was a Lieutenant Colonel in the United States Marine Corps, and his $45,000 salary continued to be paid by the Marine Corps. Jepsen, who chaired the Manpower and Personnel Subcommittee of the Senate Committee on Armed Services, had secured Secrist's appointment through a personal request to the Secretary of the Navy.

The appointment generated controversy in the press and became a campaign issue when Jepsen sought reelection in 1984. In October, 1984, challenger Tom Harkin's campaign committee issued a press release pertaining to Secrist's role on Jepsen's staff. Secrist alleges in this action that certain statements in the October press release were defamatory.

The district court[1] granted summary judgment against Secrist. Because we agree with the district court that the challenged statements are protected expressions of opinion, and, even if fact, that Secrist failed to produce sufficient evidence that the statements were made with actual malice, we affirm.

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

## I.

Secrist first became acquainted with Senator Jepsen while acting as a Pentagon legislative liaison, lobbying the United States Senate Armed Services Committee and its subcommittees, including the Subcommittee on Manpower and Personnel which Jepsen chaired. Secrist had been scheduled to begin a one year tour with the First Marine Aircraft Wing in Okinawa, Japan, when Jepsen requested he be assigned to his personal staff through the remainder of the 98th Congress.

Although an internal Marine Corps memorandum recommended strongly that the request be denied, the Secretary of the Navy acceded and commencing on July 1, 1983, Secrist officially joined Jepsen's staff. Secrist's duties for Jepsen included assisting Iowa businesses in obtaining defense contracts and investigating military personnel matters.

Secrist's appointment was reported in both the national and local press. Articles and editorials appeared in the Congressional Quarterly, the New York Times, the Washington Post, and the Chicago Tribune shortly after Secrist joined Jepsen's staff. Many Iowa papers also carried stories relating to Secrist's appointment. The Des Moines Register ran an editorial on August 12, 1983, entitled "Jepsen's Private Marine," which stated that Jepsen had " 'found a novel way to get high-priced staff help' at no cost to his Senate staff budget." Citing statements both pro and con concerning whether the appointment violated Department of Defense regulations, the Register commented that the rules had been stretched "about as far as they can stretch without actually snapping."

The editorial also questioned Jepsen's statement that Secrist would be useful in obtaining military contracts for defense businesses:

> A Marine lieutenant colonel has *that* kind of influence? But, in his snappy uniform, he ought to improve the scenery around Jepsen at election-year hearings and other gatherings in Iowa. (We hope that he won't feel required to open car doors for the senator).

Several days later, the paper published a letter from Jepsen responding to the editorial and defending his efforts to assist Iowans compete more effectively for defense dollars. After commenting that any contract awarded to Iowa would be the result of successful efforts by Iowa businesses, and not through any special "influence" on Secrist's part, the Senator rebutted the implication that Secrist's appointment was a part of his election campaign strategy. The Senator stated:

> Also, you will look in vain for Lt. Col. Secrist at any election-year hearings or public event in Iowa next year. His responsibilities lie in service to Iowa, not in "opening my car door."

Articles also appeared in the Cedar Rapids Gazette, the Quad City Times, and other Iowa papers; some supporting Jepsen's decision to secure Secrist's appointment and others, like the Des Moines Register, opposing it.

In March of 1984, Jepsen, a Republican, officially declared his intention to seek reelection to the United States Senate. Democratic party officials were quoted in the press at that time as questioning Jepsen's judgment in connection with the Secrist appointment. These officials argued Secrist's appointment was one of the reasons why Jepsen should be defeated.

During this same time period, Secrist was coordinating a federal procurement conference in Des Moines for approximately 400–500 small and medium sized Iowa businesses. Secrist traveled to Iowa numerous times on behalf of Jepsen, and twice—in May and June of 1984—Jepsen's campaign committee reimbursed Secrist for his travel expenses.

Although Jepsen's challenger, then United States Representative Tom Harkin, had declined to comment on the Secrist appointment issue when it first arose, Harkin's campaign committee issued a press release concerning the matter as the campaign drew to a close. The press release, entitled "The Jepsen Colonel Caper," questioned Jepsen's motives in securing Secrist's ap-

pointment, implying the appointment had effectively enhanced Jepsen's campaign contributions, but had not been successful in increasing Iowa's share of defense contracts. Attached to the release was a list of the campaign contributions received by the Jepsen '84 committee from 31 companies listed on the release as defense contractors.

Jepsen responded to the press release by labeling Harkin's charges as "nothing short of libelous." Jepsen stated that Secrist at no time solicited any campaign donations on Jepsen's behalf, nor had Secrist met with any political action committees. Noting that Secrist had been instrumental in creating 1,524 new Iowa jobs and in securing $452.3 million in new or pending defense contracts, Jepsen explained Secrist's travel had been paid for by his campaign because Secrist was not eligible for reimbursement from either the military or the Senate.

Harkin won the election, and now serves in the United States Senate representing the State of Iowa. Secrist retired from the Marine Corps in March of 1985 and now acts as a lobbyist for Rockwell International in Washington, D.C.

## II.

In October of 1986, two years after the press release was issued, Secrist filed suit against defendants Pam McKinney, Harkin's press secretary; John Frew, Harkin's campaign manager; and Harkin himself, alleging the release was libelous because it implied he was actively soliciting funds on behalf of Jepsen, a violation of the Hatch Act which could have subjected him to two years imprisonment under the Uniform Code of Military Justice.

Secrist alleged the following underlined statements from the first, sixth, twelfth, and thirteenth paragraphs of the press release were defamatory:

*A pentagon Marine Colonel assigned to drum up defense contracts for Iowa businesses has been more successful at raising money for Sen. Roger Jepsen's reelection bid, according to U.S. Rep. Tom Harkin, a candidate for the U.S. Senate.*

\*　　\*　　\*　　\*　　\*　　\*

*Since its formation, the Jepsen '84 Committee has received more than $88,-000 from defense contractors' contributions, including Lockheed, Boeing TRW and LTV; about 60 percent of that amount was received after Secrist joined the Jepsen staff.*

\*　　\*　　\*　　\*　　\*　　\*

*According to Harkin, Lt. Col. Secrist's involvement is clear.* In the May 17–June 30, 1984 Federal Election Commission Report, Secrist's name appeared twice for reimbursement of more than $1,000 for travel expenses during that period. The reimbursements were made from Jepsen's office account. That office account has also come under fire this year for failure to report funds to the Federal Election Commission and the Internal Revenue Service.

*"While the Lt. Col. may not be opening the Senator's car doors," Harkin said. "It appears that he is successful at opening doors to defense campaign money coffers on behalf of the Senator."*

The complete text of the press release is reprinted as an Appendix to this opinion.

After the close of discovery, defendants moved for summary judgment. The district court held plaintiff Secrist was a public official and a public figure,[2] and hence

---

**2.** In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974), the Supreme Court identified two bases for determining whether an individual is a public figure:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a

particular public controversy and thereby becomes a public figure for a limited range of issues.

*Id.* (cited in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246 n. 3, 106 S.Ct. 2505, 2509 n. 3, 91 L.Ed.2d 202 (1986)). The district court in this case found Secrist was a limited-purpose public figure based upon his undertaking of the assignment to Senator Jepsen's personal staff. *See Anderson,* 477 U.S. at 246 n. 3, 106 S.Ct. at 2509

was required to show by clear and convincing evidence that each defendant acted with actual malice in publishing the statements contained in the press release. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 725–26, 728–29, 11 L.Ed.2d 686 (1964); *Speer v. Ottaway Newspapers, Inc.,* 828 F.2d 475, 476 (8th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988); *Hoffman v. Washington Post Co.,* 433 F.Supp. 600, 605 (D.D.C.1977), *aff'd mem.,* 578 F.2d 442 (D.C.Cir.1978).

The district court found no evidentiary basis for plaintiff's claim that any defendant acted with actual malice—either knowledge of falsity or with reckless disregard as to whether the information in the press release was false or not. *See St. Amant v. Thompson,* 390 U.S. 727, 728, 88 S.Ct. 1323, 1324, 20 L.Ed.2d 262 (1968). In addition, the court concluded that in the context of a political campaign, the audience of voting citizens would interpret the release as a challenger's contention that Senator Jepsen was politically motivated in securing Secrist's services, "clearly an extension of the substantial public debate and comment earlier about why the Defense Department allowed Senator Jepsen to have the plaintiff on his staff." Ruling that the disputed portions of the press release constituted protected opinion, the court stated: "Opinion is the trademark of political rhetoric, even when set forth in narrative terms. Clearly the press release was a message entirely political in context and in wording."

Secrist challenges the court's ruling on appeal, arguing the press release falsely accuses him of directly soliciting defense contractors for campaign contributions on behalf of Senator Jepsen, which Secrist contends is a statement of fact, not opinion. Secrist also maintains a genuine issue of material fact exists on the question of malice, primarily because of defendants' failure to investigate his activities prior to publishing the release. Secrist contends defendants were all experienced politicians, who easily could have called Secrist or the

defense contractors who contributed to Jepsen's campaign committee to find out whether Secrist had been directly involved in fundraising. Their failure to do so, according to Secrist, amounts to actual malice.

### III.

█ We begin with the proposition that defendants are liable only for false statements of fact: expressions of opinion are protected by the First Amendment. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974); *Deupree v. Iliff,* 860 F.2d 300, 304 (8th Cir.1988); *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.) (en banc), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). The district court correctly granted summary judgment in this case if the challenged statements are opinion, rather than fact, because this issue is one of law for the court to decide. *Deupree,* 860 F.2d at 303; *Janklow,* 788 F.2d at 1305 n. 7.

In determining where to draw the line between what constitutes "fact" and "opinion," we are guided by this Court's en banc decision in *Janklow* as well as our more recent decision in *Deupree.* In *Janklow,* the Court adopted an expanded version of the four factors suggested by the majority opinion in *Ollman v. Evans,* 750 F.2d 970, 979 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). *See Janklow,* 788 F.2d at 1302–03. Two of these factors require an examination of the specific language used: how precise and how verifiable are the challenged statements? The remaining factors consider the context, both the literary context and the broader public context, in determining how readers or listeners would regard the statements: does the context signal that opinion is being offered? *See id.; Deupree,* 860 F.2d at 303; *Ollman,* 750 F.2d at 979–84, 1000–05.

We consider first the context of the statements at issue here, since "[c]ontext is crucial and can turn what, out of context,

n. 3. Secrist does not challenge this ruling on appeal.

appears to be a statement of fact into 'rhetorical hyperbole,' which is not actionable." *Ollman,* 750 F.2d at 1000 (J. Bork, concurring). *See Deupree,* 860 F.2d at 303; *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (9th Cir.1980). There may be no public context more contentious than a political campaign. *See generally New York Times Co. v. Sullivan,* 376 U.S. 254, 273 n. 14, 84 S.Ct. 710, 722 n. 14, 11 L.Ed.2d 686 (1964); *Ollman,* 750 F.2d at 1005 (J. Bork, concurring). While political commentators often decry the "low level" of campaign tactics or rhetoric, the debate which accompanies public examination of candidates for public office lies at the very heart of the First Amendment and is essential to our democratic form of government. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982); *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964); *Janklow,* 788 F.2d at 1304.

> It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.

*New York Times,* 376 U.S. at 281, 84 S.Ct. at 726 (citing *Coleman v. MacLennan,* 78 Kan. 711, 724, 98 P. 281, 286 (1908)).

In recognition of the importance of "uninhibited, robust and wide-open" political debate, and of the "vehement, caustic, and sometimes unpleasantly sharp attacks" which often follow such debate, *see New York Times Co.,* 376 U.S. at 270, 84 S.Ct. at 720 courts have recently suggested that those who place themselves in the political arena or willingly participate in public debate "must accept a degree of derogation that others need not." *Janklow,* 788 F.2d at 1304 n. 5 (citing *Ollman,* 750 F.2d at 1002 (J. Bork, concurring)). They must, in effect, have "tougher hides." *See Ollman,* 750 F.2d at 1005.

There can be no doubt but that in this case Lt. Col. Secrist found himself in the midst of a political controversy.[3] The statements he challenges in this appeal were part of a political campaign, issued in a press release by a challenger to an incumbent Senator concerning Secrist's employment on the Senator's staff. It is difficult to imagine a public context which would point more strongly toward "opinion" than this one. *See Janklow,* 788 F.2d at 1303. *Cf. Deupree,* 860 F.2d at 303–04 (call-in radio show forum for discussing sex education in schools); *Janklow,* 788 F.2d at 1304–05 (motivations of Governor in directing investigation); *Ollman,* 750 F.2d at 1002–05 (controversial professor's candidacy for chair of department of politics and government at University of Maryland).

The literary context of the press release also supports a finding that the challenged statements are Candidate Harkin's opinion, rather than "fact." The "literary context" factor includes the type of forum or "social context" in which the statement was made, the category of publication, its style of writing, and the intended audience. *Janklow,* 788 F.2d at 1302–03. The forum or social context in this case is, as we have said, a political campaign, in which one would expect to hear a great deal of opinion concerning the performance of the incumbent Senator. The category of publication is a press release from the Senator's challenger. Suffice it to say that a campaign press release is not a research monograph; such a release is at least as likely to signal political opinion as a newspaper editorial or political cartoon. *See Ollman,* 750 F.2d at 986–87; *King v. Globe Newspaper Co.,* 400 Mass. 705, 512 N.E.2d 241, 245 (1987), *cert. denied,* — U.S. —, —,

---

**3.** While Secrist was assigned by his superiors to Jepsen's staff, both Jepsen and Secrist acknowledge Secrist was asked by Jepsen if he would be interested in the position prior to any efforts on Jepsen's part to secure Secrist's appointment. Secrist testified he indicated to Jepsen that he was interested.

108 S.Ct. 1121, 1227, 99 L.Ed.2d 281, 427 (1988).

The writing style of the release is opinion-oriented as well. As the district court found, the press release "was a message entirely political in context and in wording," which the audience of the voting public would clearly interpret as challenger Harkin's "contention that the incumbent Senator was politically motivated in using the services of the plaintiff, a career military person."

The language of the release, considered as a whole, supports the district court's interpretation. The release directly attributes three of the challenged statements to candidate Harkin, which, given the other statements in the release, signals that readers should expect Harkin's opinion. Harkin's statements are accompanied by background information on Secrist's appointment, quotes from news articles which reported on the controversy surrounding the appointment, and Jepsen's own response to the controversy, including Jepsen's remark that Secrist would not be "opening my car door." Harkin's repetition of the "car door" phrase further suggests his comments represent his opinion of Jepsen's motivation in securing Secrist on his staff. Cf. Deupree, 860 F.2d at 303; Ollman, 750 F.2d at 982–83.

Finally, we turn to the precision and verifiability of the challenged statements themselves. Secrist claims the press release accuses him of a violation of the Hatch Act, which as a military officer could subject him to two years' imprisonment, because it states (1) he "has been more successful at raising money for Sen. Roger Jepsen's reelection bid" than helping Iowa businesses obtain defense contracts; (2) 60% of the more than $88,000 received by the Jepsen campaign committee was received after Secrist joined the staff; and (3) Secrist was "successful at opening doors to defense campaign money coffers on behalf of the Senator."

The press release contained a list of the contributions received from companies identified as defense contractors as reported by the Jepsen reelection campaign committee, and Secrist does not challenge the statement that 60% of the funds were received after July 1, 1983, when he joined Jepsen's staff. What Secrist challenges is the inference he draws from all three statements that he played a role in the Senator's successful fundraising efforts.

We are thus faced with the issue of whether statements concerning "successful fundraising" and "opening doors to defense money coffers" are sufficiently precise and verifiable to constitute statements of fact. Statements which are "loosely definable" or "variously interpretable" cannot in most contexts support an action for defamation. Ollman, 750 F.2d at 980. While Secrist maintains the release necessarily implies he was actively involved in the direct solicitation of funds, we are not convinced that "fund-raising" has as precise a meaning as Secrist implies. There is no evidence in this record that Secrist ever directly solicited campaign contributions for Senator Jepsen. Nonetheless, as Harkin's press secretary testified, there are numerous ways of raising money for an incumbent Senator:

> One of the ways is to go out and actually solicit contributions, ask people for money.

> Another way is simply through what can be referred to as goodwill fund raising, or fund raising that occurs because an employee or someone who is working on your behalf goes out and does a job for someone that results in a campaign contribution.

> By his very presence on Senator Jepsen's staff, Jim Secrist sent a signal to the defense community, by the fact that the Secretary of the Navy was willing to do something very unusual, something that the Pentagon said was extremely unusual, that being detail a Marine Lieutenant Colonel to the personal staff of a United States Senator to supplement that staff, to act as a liaison between the Senator's office, defense contract[ors], and businesses in Iowa.

> That sends a signal that this particular Senator is a friend and is someone to support.

And to the extent that any of that message resulted in campaign contributions from defense contractors, then Mr. Secrist raised money.

To the extent that any small business person in the state of Iowa that Colonel Secrist worked with and helped out was pleased enough to support Senator Jepsen's campaign for a campaign contribution or to support the campaign in another way that led to a campaign contribution, Colonel Secrist raised money.

To the extent that Colonel Secrist was traveling in Iowa, meeting with small business people, acting as the Senator's emissary, if you will, assisting small businesses and enhancing Senator Jepsen's reputation with these small business people, and that resulted in campaign contributions, then Colonel Secrist was raising money.

Secrist agrees that he was "very active on behalf of Iowa for almost two years," and that he "assisted hundreds of Iowa business firms in their efforts to sell to the government." Whether his efforts or his presence on the staff contributed to Jepsen's "successful fundraising" is not as easily verifiable as Secrist suggests, and we find that in context the challenged statements concerning fundraising are not so precise, specific, or verifiable that they can be equated—as Secrist alleges—as akin to an accusation of criminal conduct. *Cf. Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284–85, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) (epithet "traitor" was opinion, not imputation of actual criminal conduct in context of labor dispute); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970) ("blackmail" charge represented opinion of developer's tactics, not accusation of a crime). *See also Deupree,* 860 F.2d at 303.

We conclude that under all of the circumstances surrounding publication of the press release, the challenged statements could only be interpreted by readers of the release as Harkin's opinion on the effect of Secrist's appointment to Jepsen's staff. Accordingly, we find the district court correctly granted summary judgment against Secrist because the statements of which he complains are absolutely protected by the First Amendment.

## IV.

■ Even if the statements concerning "successful fundraising" or "opening doors to defense campaign money coffers" could be construed as statements of fact, however, we would affirm the district court's grant of summary judgment in this case, because we also agree with the district court that Secrist failed to present sufficient evidence that defendants acted with actual malice.

To withstand a motion for summary judgment, a public official or public figure must present evidence to support a jury finding that he or she has shown with convincing clarity that a defendant acted with actual malice. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 257, 106 S.Ct. 2505, 2513–14, 2514, 91 L.Ed.2d 202 (1986); *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1292–93 (D.C.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Speer v. Ottaway Newspapers, Inc.,* 828 F.2d 475, 476 (8th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988). Actual malice means acting with knowledge that the challenged statements were false or with reckless disregard for whether they were false or not. *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. In evaluating whether summary judgment should be granted, we are obliged to make our own independent review of the record to ensure the principles of actual malice are constitutionally applied. *Id.* at 285, 84 S.Ct. at 728; *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984); *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d at 1293; *Speer,* 828 F.2d at 476–77.

Secrist makes no claim that defendants in this case acted with knowledge that their statements were false. Thus, in order to succeed in his libel action, Secrist must

establish they acted with "reckless disregard," that is, they "in fact entertained serious doubts as to the truth of [their] publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed. 2d 262 (1968), which amounted to a "high degree of awareness of ... probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d at 1292–93; *Speer*, 828 F.2d at 478.

A review of the evidence presented in this case convinces us Secrist has not met his burden. At the time Harkin's press secretary Pam McKinney drafted the press release at issue, she had been told the following information: (1) while in a Des Moines restaurant, Teresa O'Brien, a Harkin staff member, had overheard two individuals whom she believed to be Secrist and a Jepsen staff member discussing something they were going to do for Jepsen's campaign in Iowa; (2) Jepsen's campaign committee had twice reimbursed Secrist for travel expenses; (3) Department of Defense expenditures in Iowa had decreased since Secrist joined Jepsen's staff; and (4) Jepsen had reported an increase in contributions from defense-contractor political action committees since Secrist's appointment. Defendants Harkin and his campaign manager John Frew had basically been told the same information.

All three defendants admitted they conducted no further investigation of the defense contractors who had contributed to Jepsen's campaign or of Secrist himself to determine whether Secrist had directly solicited funds on behalf of Jepsen. Secrist points to this lack of investigation as evidence of reckless disregard for the truth. We cannot agree. Reckless conduct is not measured by whether a reasonably prudent person would have published, *"or would have investigated before publishing." St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325 (emphasis added). *See Speer*, 828 F.2d at 478.

In *St. Amant*, the Supreme Court reversed a state court judgment against defendant St. Amant, who had published statements of a union member, Albin, falsely charging plaintiff Thompson with criminal conduct. 390 U.S. at 728–29, 733, 88 S.Ct. at 1324, 1326. The Court ruled St. Amant had not acted with reckless disregard for the truth, even though he had no personal knowledge of Thompson's activities, he failed to verify Albin's statements with union officials, and he gave no consideration to whether or not the statements defamed Thompson. *Id.* at 730, 88 S.Ct. at 1325. The Court explicitly stated "[f]ailure to investigate does not in itself establish bad faith." *Id.* at 733, 88 S.Ct. at 1326.

Likewise in *Speer*, this Court held persons having responsibility for publication of a newspaper editorial did not act with reckless disregard in adopting a version of an arrest given by a trusted employee over that of plaintiff Speer and other citizen witnesses. 828 F.2d at 478. We found the paper in hindsight should prudently have pursued its known leads on the story before publishing the editorial, but nonetheless held "a negligent failure to investigate does not itself establish recklessness for purposes of a libel suit." *Id.* *See New York Times*, 376 U.S. at 287–88, 84 S.Ct. at 730.

Secrist attempts to distinguish *St. Amant* and *Speer* by citing *King v. Globe Newspaper Co.*, 400 Mass. 705, 512 N.E.2d 241 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988), in which the Supreme Judicial Court of Massachusetts reversed a grant of summary judgment in favor of the Globe Newspaper Company and Globe reporter David Farrell. Farrell had written an article which was published by the Globe and which accused then Governor King of calling a judge and demanding the judge change a decision rendered in a gang-rape case. 512 N.E.2d at 248. The reporter testified his only source for the statement was then State Treasurer Robert Crane. *Id.* at 250. When Crane testified he had not heard the conversation himself but only learned of it through an informant whom Crane could not name, the court held a jury would be warranted in finding Farrell had "obvious reasons to doubt the veracity and accuracy, not only

of Crane, but of Crane's undisclosed informant and any other informants in the chain of communication." *Id.* at 251.

In this case, defendants relied upon public reports filed by Jepsen's campaign committee and issued by the Department of Defense, as well as the observation of a staff member whose credibility has not been questioned.[4] Defendants certainly cannot avoid liability by simply asserting that they published the press release in the good faith belief the statements were true, but nothing in this record suggests with convincing clarity that defendants acted in bad faith. Their statements concerning the effect of Secrist's presence on Jepsen's ability to raise money were not so implausible that only a reckless person would have published them, nor is there any evidence that the statements were entirely a product of defendants' imaginations. *See St. Amant*, 390 U.S. at 732–33, 88 S.Ct. at 1326; *Speer*, 828 F.2d at 478.

### V.

In sum, we agree with the district court's conclusion that summary judgment in favor of defendants is warranted because the statements challenged by Secrist in this appeal, made in the context of a political campaign by a challenger to an incumbent Senator and directed at the Senator's motives for securing Secrist's appointment to his personal staff, constitute protected statements of opinion under the First Amendment. Moreover, even if the statements could be construed as fact, we further agree with the district court that Secrist has failed to submit sufficient evidence of actual malice. The judgment of the district court is in all respects affirmed.

### APPENDIX

### THE JEPSEN COLONEL CAPER

DES MOINES—A pentagon Marine Colonel assigned to drum up defense contracts for Iowa has been more successful at raising money for Sen. Roger Jepsen's reelection bid, according to U.S. Rep. Tom Harkin, a candidate for the U.S. Senate.

Lt. Col. James E. Secrist was the subject of controversy last year when the Pentagon paid his $45,000 annual salary while assigning him to work as a member of Sen. Jepsen's personal Washington staff.

According to the Navy and Sen. Jepsen's office, Secrist was assigned to Jepsen to assist businesses in Iowa with the Pentagon's procurement process and obtain more defense contracts for the state.

During the time Secrist has been on the Jepsen staff, however, the percentage of national defense contract dollars awarded to Iowa businesses has not increased.

In the first half of FY 1984, Iowa has only received $132 million from defense contracts, approximately one-third of the total received in 1983. (Source: Department of Defense Office of Information).

Since its formation, the Jepsen '84 Committee has received more than $88,000 from defense contractors' contributions, including Lockheed, Boeing TRW and LTV; about 60 percent of that amount was received after Secrist joined the Jepsen staff.

Secrist's assignment to the Jepsen office staff was approved in May of 1983 after the Senator personally sought and received permission from the Secretary of the Navy.

As chairman of the Armed Services Subcommittee on Manpower and Personnel, Jepsen oversees the process which sets employee ceilings for each military branch and has jurisdiction over military pay and benefits.

[Illegible] ... approved Secrist's assignment to Jepsen's office in response to a May 24, 1983 letter from Jepsen to Navy Secretary John F. Lehman Jr. In the letter, Jepsen asked Lehman to "take action to assign Lieutenant Colonel Secrist to my personal staff through the remainder of

---

**4.** Secrist admits Harkin staff member Teresa O'Brien may have overheard Jepsen staff member Kirk Farrell "explaining to me his campaign plans and activities." Secrist stated that the conversation occurred in a social setting and was not meant to brief him on campaign activities or involve him in the campaign, but rather Farrell was simply relating to Secrist what Farrell had been doing.

the 98th Congress." Secrist became a member of the Jepsen staff on July 1, 1983.

Congressional Quarterly also reported, "Defense Department rules (Directive 1000.17) governing the assignment of employees to non-department offices point out that such assignments are 'generally not favored and shall be rigorously controlled' and will be made 'only in furtherance of specifically identifiable interests of the Defense Department.' Neither Defense Department nor Navy spokesmen could name the 'specifically identifiable interests' furthered by Secrist's assignment." (CQ page 1660 Aug. 13, 1983).

In an August 20, 1983 letter to the Des Moines Register, Jepsen wrote, "Also, you will look in vain for Lt. Col. Secrist at any election-year hearings or public event in Iowa next year. His responsibilities lie in service to Iowa not in 'opening my car door.' "

According to Harkin, Lt. Col. Secrist's involvement is clear. In the May 17–June 30, 1984 Federal Election Commission Report, Secrist's name appeared twice for reimbursement of more than $1,000 for travel expenses during that period. The reimbursements were made from Jepsen's office account. That office account has also come under fire this year for failure to report funds to the Federal Election Commission and the Internal Revenue Service.

"While the Lt. Col. may not be opening the Senator's car doors," Harkin said. "It appears that he is successful at opening doors to defense campaign money coffers on behalf of the Senator."